**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

_____

| | |
|---|---|
| **DESIREE WOODS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CASE NO.** |
| | ) |
| **DEKALB COUNTY SCHOOL** | ) |
| **DISTRICT,** | )        **JURY DEMAND** |
| **ANGELA SMITH, Individually** | ) |
| **and in her official capacity as** | ) |
| **Coordinator III, at Eagle Woods** | ) |
| **Academy for DeKalb County** | ) |
| **School District,** | ) |
| **AND** | ) |
| **MICHELE SUMMERLIN,** | ) |
| **Individually and in her official** | ) |
| **capacity as Executive Director,** | ) |
| **Special Education,** | ) |
| **for DeKalb County School District,** | ) |
| | ) |
| **Defendants.** | ) |

_____

## COMPLAINT

NOW COMES Plaintiff DESIREE WOODS ("Woods" or

"Plaintiff") through undersigned counsel and makes her claims against

Defendants, DeKalb County School District ("DCSD"), Angela Smith,

Individually and in her official capacity as Coordinator III, at Eagle

1

Woods Academy for DeKalb County School District ("Smith"), and Michele Summerlin, Individually and in her official capacity as Executive Director, Special Education, for DeKalb County School District ("Summerlin") (collectively "Defendants") showing the Court as follows:

## SUBJECT MATTER JURISDICTION

1.

This action is brought pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), as amended, for race and retaliation discrimination.

2.

This action is brought pursuant to 42 U.S.C. § 1983.

3.

These claims are federal questions under 28 U.S.C. § 1331 and civil rights matters under 28 U.S.C. § 1343, and jurisdiction and venue are proper in this court.

## PERSONAL JURISDICTION

4.

Defendant DCSD is a governmental entity and may be served by personal service on Superintendent Dr. Devon Horton at 1701 Mountain Industrial Blvd

Stone Mountain, Georgia 30083.

5.

Defendant Smith, Individually and in her official capacity as Coordinator III, at Eagle Woods Academy for DeKalb County School District, may be served by personal service at her place of employment at Eagle Woods Academy, 5931 Shadow Rock Dr., Lithonia, GA 30058.

6.

Defendant Summerlin, Michele Summerlin, Individually and in her official capacity as Executive Director, Special Education, for DeKalb County School District may be served by personal service at her place of employment at DeKalb County School District, Department of Exceptional Education, 1040 King Way Drive, Lithonia, GA 30058.

**<u>FACTS OF THE CASE</u>**

7.

In or around March 2012, Woods was hired as Director of DeKalb-Rockdale GNETS by Defendant.

8.

The Eagle Woods Academy is the school location where Woods had her

office at all times relevant to her complaint.

9.

This is where Angela Smith had her office as well.

10.

DeKalb-Rockdale GNETS had two site-based programs and several transition programs out in schools.

11.

In or around 2016/17, Woods was contacted by the DCSD Office of Legal Affairs (OLA) and told that she had been accused of being a racist.

12.

Woods was not given any paperwork or copies of any complaint forms with regard to the accusation of being a racist.

13.

Woods was interviewed by two people from OLA and adamantly denied the accusation of being a racist.

14.

Woods was very upset by the unfounded charge of being a racist and shared this with some of her colleagues.

4

15.

It was then shared with Woods, by both white and African-American staff members that Angela Smith ("Smith") and Joan Granston ("Granston") commented frequently that they "hate white people."

16.

It was also shared with Woods that Granston also commented, "White teachers cannot teach African-American students."

17.

It was further shared with Woods that Smith had asked an African-American, "Why are you taking orders from a white woman?"

18.

On one occasion, an African-American staff member shared with Woods that they were pulled in to Smith's office and asked repeatedly, "Why are you listening to a white person?  Why do you support Ms. Woods?  You know that she does not have your back.  She does not look out for you.  You need to support us (Smith and Granston).  We need to stick together and build an alliance against Ms. Woods."

19.

Woods's understanding was that staff from OLA interviewed several staff

members, and this process went on for over a year.

20.

When the OLA staff came back to meet with Woods at Eagle Woods Academy ("EWA"), she asked how much longer the investigation would continue.

21.

The response from OLA was that one of the members of the OLA team left the county and took all the information with them.

22.

Once the investigation was completed, and Woods was formally cleared of any wrongdoing, her supervisor at the time, Dr. Chezia Calloway ("Dr. Calloway"), asked the Regional Superintendent, Dr. Michelle Jones ("Dr. Jones"), when Woods was going to get a copy of her file for her records.

23.

Dr. Jones stated in response, "You do not want to see it."

24.

Woods has never received her file or any of the information related to the investigation.

25.

On or about February 1, 2018, a staff member informed Woods that a

student's grandmother had made a complaint to the county office regarding a student's phone being stolen.

26.

Woods had been involved with the stolen phone situation earlier in the week.

27.

Smith failed to notify Woods as soon as Smith knew the complaint was filed.

28.

On or about February 21, 2018, there were allegations of two EWA students having sex on school grounds.

29.

A parent came to the after hours to talk to Officer Carroll.

30.

After the parent left, Woods went into Officer Carroll's office and Smith was sitting there.

31.

Woods and Smith discussed what was shared between the Officer and the parent.

7

32.

The comment was made by Smith that the incident did occur.

33.

Woods expressed her concerns and disappointment.

34.

Smith responded, "Rapes and sexual assaults occur at all high schools."

35.

On or about February 23, 2018, Smith failed to notify Woods that Smith decided to move a student from 6th to 8th grade.

36.

There was no evidence of a meeting being held with the parents.

37.

Smith also failed to notify Woods that she decided to move a student from full day to half day.

38.

Woods was concerned the move from full day to half day denied the student a Free Appropriate Public Education (FAPE) as required by the Individuals with Disabilities Education Act (IDEA).

39.

On or around June 20, 2018, two staff members from OLA, Jamal Crawford ("Crawford") and Marissa Key ("Key"), met with Woods to inform her that a staff member, Granston, had made racial allegations against Woods.

40.

Crawford and Key stated it was more about Granston's perceptions than what was really going on.

41.

Emails from on or around December 18, 2018 document Smith's lack of knowledge regarding Positive Behavior Interventions and Supports ("PBIS") implementation status.

42.

As one of her performance goals, Smith stated that Eagle Woods would move from Emergent to Operational PBIS status.

43.

Woods had to point out to Smith that Eagle Woods was already Operational and Smith needed to revise her performance goals, which is part of Smith's yearly evaluation.

9

44.

On or about December 19, 2018, Smith let staff vote on whether or not a student could come to school the last day before the holidays due to the student's behavior.

45.

Smith voted for the student to remain home.

46.

The student was not marked as having out-of-school suspension ("OSS").

47.

On or about March 18, 2019, a leadership meeting was held by the team while Woods was out of the office at a conference.

48.

As the Director, Woods was to be at all leadership meetings to make final decisions.

49.

Smith called the meeting, but Woods was not notified before or after the meeting.

50.

Other staff members reported the occurrence of the meeting to Woods.

10

51.

Woods was finally given a copy of the meeting minutes, which did not include all topics discussed.

52.

Woods was told by Dr. Baety, who was in the meeting, that negative comments were made about Woods by Smith, which were omitted.

53.

On or about July 11, 2019, Woods issued a letter of direction to Smith due to concerns in relation to her duties and responsibilities as Coordinator III (i.e., principal in the building).

54.

The specific areas in the letter of direction included Communication and Accountability.

55.

Smith failed to report in-school suspension ("ISS") incidents, which is a violation of FAPE.

56.

On or about September 11, 2019, Woods was served with a civil action complaint from a former staff member (Granston), who claimed Woods

11

discriminated against African-American staff employed in the GNETS program.

57.

Granston filed an EEOC charge against Woods in July 2018, but the finding thereon was a lack of evidence.

58.

The civil action did not go anywhere, as the case was dismissed by Granston.

59.

On or about September 29, 2021, there was a meeting of Smith with Dr. Edward Baety regarding Donors Choose.

60.

Smith falsely accued Dr. Baety of asking for donations for the school and then keeping the items for himself.

61.

Smith went around Woods to the Regional Superintendent, Dr. Antoinette Campbell.

62.

Following an investigation, the accusation made by Smith was found to be unwarranted.

63.

On or about November 1, 2021, an African-American student at EWA passed away.

64.

Woods offered to collect money from staff (optionally) to pay for funeral expenses.

65.

Smith commented to Dr. Baety that a white woman should not be collecting money for an African-American child's funeral.

66.

On or about February 11, 2022, Woods met with Michele Summerlin, Executive Director for Exceptional Education.

67.

Summerlin wanted Smith and Woods to meet with the GLRS (Georgia Learning Resources System [provides professional learning and other resources to educators and families of students with disabilities]) Director about planning team building activities since the staff is reporting that they believe there is a divide between Woods and Smith.

68.

According to some staff, there is a Team Woods and a Team Smith.

69.

Allegedly, there are those staff who only listen to Woods and those who only listen to Smith.

70.

As Woods was the Director, all staff should have followed her directions.

71.

On or about February 10, 2022 [Date confirmed correct], two staff members from OLA came to EWA to speak with Woods about Smith.

72.

Woods was not notified the OLA staff were coming.

73.

The OLA staff went straight to Angela Smith's office upon arrival to let Smith know they were there to see Woods.

74.

OLA staff went directly to Smith notwithstanding that Woods' office was near the front of the building so they could have gone directly to Woods.

14

75.

Woods was notified by Smith that the OLA staff were present to see Woods.

76.

The OLA staff asked Woods about Smith's job performance, and Woods answered them honestly.

77.

The OLA staff asked for documentation such as letters of direction.

78.

Woods replied that Woods had complained about Smith in the past and nothing was ever done.

79.

The OLA staff stated that they could not do anything at that time.

80.

The OLA staff said they needed documentation.

81.

On or about March 28, 2022, Woods met with Michele Summerlin, Terri Jenkins (Director of GLRS), and Smith.

82.

This was their initial meeting to discuss team building at EWA.

15

83.

Summerlin and Jenkins stated that there was a lack of unity at EWA.

84.

We have to have better communication and we need to engage in active listening, they said.

85.

On or about March 31, 2022, an incident occurred at EWA regarding a middle school student in the hallway.

86.

Smith asked Dr. Baety to sit with the student even though the Campus Supervisor was standing across from the student.

87.

Smith became angry when Dr. Baety went back into his office.

88.

Smith later contacted Woods to inform her of the situation and let her know she had written a letter of direction to Dr. Baety.

89.

Woods told Smith not to give Dr. Baety the letter and that Woods needed to investigate.

16

90.

After speaking to several staff, it was found that the letter of direction was unwarranted.

91.

Woods informed Angela Smith of that, and Smith reached out to the Regional Superintendent because she disagreed with the decision.

92.

On or about April 7, 2022, Melinda Maddox (retiree) was assigned to interview all staff at EWA including Woods regarding any complaints they may have had.

93.

Woods never received a copy of Maddox's notes and was not informed of the details of Maddox's conversations with staff.

94.

There were letters written by staff that were sent to AIC (Administrative and Instructional Complex - administrative offices where the Regional Superintendents were housed and/or the Special Education office of Ms. Summerlin.

95.

The letters contained complaints about GNETS, but the documents were

17

never shared with Woods.

96.

Summerlin, who as Woods' immediate supervisor, claimed she never saw the letters and therefore did not know what they stated.

97.

Summerlin provided little support to Woods to assist her in doing her job.

98.

GNETS staff members would go to Summerlin's office to voice complaints about GNETS on a regular basis.

99.

Yet, Summerlin rarely had time to discuss issues with Woods in order to improve the program.

100.

Had Woods had this information, she would have reviewed all policies and procedures to make changes if needed.

101.

Woods received a copy of Maddox's report, which was dated June 30, 2022, which was her last day at DCSD.

18

102.

Employee Relations did not share the report with Woods.

103.

Dr. Baety provided a copy of the report once he received it as part of an open records request.

104.

Upon reviewing the report, Woods found it contained many errors.

105.

The report was not factual but rather one based on falsehoods made by staff who declined to tell the truth.

106.

One of the last recommendations listed on the report was to move Woods' office to a central location in order to minimize reporting issues at EWA.

107.

As the Director of GNETS at DeKalb-Rockdale, Woods did not see how she would be able to fulfill her job responsibilities both with DCSD and the Georgia Department of Education (DOE) when she was at a remote location.

108.

At the state level, Woods' name and certification was attached to DeKalb-

Rockdale GNETS.

109.

Woods was in charge of the budget, the staff, the facility, and making sure the strategic plan was followed as outlined by the DOE.

110.

This would have been impossible to do had Woods not had an on-site office in which to observe staff and students.

111.

Woods believes and contends that this recommendation was made to appease Angela Smith.

112.

On or about May 16, 2022, Woods' evaluation was completed by Summerlin, her supervisor.

113.

Woods told Summerlin that Baety shared with Woods that Angela Smith made the comment about Woods as a white person not being an appropriate person to be collecting money for an African-American child's funeral.

114.

Summerlin's response was "Why would he tell you that?"

20

115.

Woods was taken aback that Summerlin's concern was Dr. Baety's sharing rather than Smith's racial comment.

116.

Summerlin did not provide the support Woods needed.

117.

Summerlin listened to other staff and did not ask for Woods' side of the story.

118.

Summerlin always assumed that Woods was in the wrong.

119.

Summerlin is African-American.

120.

Woods wanted to continue working for DCSD longer and to serve the children of DeKalb.

121.

However, the racially discriminatory treatment she received was intolerable, and she was constructively terminated.

122.

The discriminatory actions described herein, including but not limited to direct racial discrimination served to create a hostile work environment for Woods.

123.

At least Summerlin and Smith conspired for the purpose of depriving Woods of the equal protection of the laws, the equal privileges and immunities under the laws, and for the purpose of preventing or hindering the constituted authorities of Georgia from giving or securing to Woods the equal protection of the laws.

124.

At least Summerlin and Smith did, or caused to be done, acts in furtherance of the object of their conspiracy, whereby Woods was injured in her person and property, and deprived of having and exercising her rights and privileges of a citizen of the United States.

125.

The conspiracy to prevent Woods from pursuing her equal protection, equal privileges and immunities under the laws, and to prevent and hinder the constituted authorities of Georgia from giving or securing to Woods the equal

protection of the law was successful.

126.

Woods is a white woman.

127.

Woods was well-qualified for her position and had significant relevant experience.

128.

Woods' qualifications were not questioned.

129.

Woods was subjected to discriminatory treatment in the terms and conditions of her employment as descried above, being generally in the nature of unfair treatment, harassment, bullying, and intimidation.

130.

Defendants' treatment of Woods was based on race as described herein.

## COUNT I: RACE DISCRIMINATION UNDER SECTION 1981 and 1983 (including Constructive Termination)

131.

Paragraphs 1 to 130 incorporated herein by reference as if recited

verbatim.

132.

Woods suffered the discriminatory treatment described herein based on her race.

133.

Woods is white woman and a member of a protected class with respect to her race.

134.

Woods was qualified for her job.

135.

Woods was specifically excluded from many communications.

136.

Woods was discouraged from participating in activities indicated to be exclusively for African-American individuals.

137.

Woods was professionally undermined.

138.

Woods was forced to retire before she wanted to or otherwise would have.

139.

Other employees were discriminated against for association with and support of Woods, which discrimination hurt Woods very much, causing her pain and emotional distress as well as frustration and despair.

140.

The discrimination described herein altered the terms, conditions, and privileges of Woods' employment and caused her damages.

141.

Woods lost salary and benefits.

142.

Characterization of Woods treatment other than stated herein is pretextual.

143.

The real reason for Woods' treatment was discrimination.

144.

Woods' mistreatment and constructive termination were improper and based on racial animus and actions of Defendants, their employees, officers, managers, and agents, including but not limited to Smith and Summerlin.

145.

Defendant DeKalb County School District has a history of policies,

customs, and practices hostile to, antagonistic to, and violative of the civil rights of its employees and students, as exemplified in cases including but not limited to:

a) *Hollis v. DeKalb County School District*, 1:21-cv-01351-SEG, GAND

b) *Sonja Floyd Keith v. DeKalb County School District*, 1:21-cv-2539-SEG-CMS, GAND and

c) *Fredrick Joiner v. DeKalb County School District*, 17CV11306, DeKalb County Superior Court, State of Georgia.

146.

Defendants violated Woods' rights to equal protection of law and due process under the 14th Amendment to the United States Constitution, which rights are well established.

## COUNT II: RACIALLY HOSTILE WORK ENVIRONMENT UNDER SECTION 1981 and 1983

147.

Paragraphs 1 to 130 incorporated herein by reference as if recited verbatim.

148.

Woods suffered the discriminatory treatment described herein based on her

26

race.

149.

Woods is white woman and a member of a protected class with respect to her race.

150.

Woods was qualified for her job.

151.

Woods was subject to unwelcome harassment, which was based on her race.

152.

Woods was specifically excluded from many communications.

153.

Woods was discouraged from participating in activities indicated to be exclusively for African-American individuals.

154.

Woods was professionally undermined.

155.

Woods was forced to retire before she wanted to or otherwise would have.

27

156.

Other employees were discriminated against for association with and support of Woods, which discrimination hurt Woods very much, causing her pain and emotional distress as well as frustration and despair.

157.

The discrimination described herein was sufficiently severe or pervasive to alter the terms, conditions, and privileges of Woods' employment, create a discriminatorily abusive working environment, and caused her damages.

158.

Woods lost salary and benefits.

159.

Characterization of Woods treatment other than stated herein is pretextual.

160.

The real reason for Woods' treatment was discrimination.

161.

Woods' harassment, mistreatment, and constructive termination were improper and based on racial animus and actions of Defendants, their employees, officers, managers, and agents, including but not limited to Smith and Summerlin.

28

162.

Defendant DeKalb County School District has a history of policies,

customs, and practices hostile to, antagonistic to, and violative of the civil rights

of its employees and students, as exemplified in cases including but not limited

to:

a) *Hollis v. DeKalb County School District*, 1:21-cv-01351-SEG, GAND

b) *Sonja Floyd Keith v. DeKalb County School District*, 1:21-cv-2539-SEG-

   CMS, GAND and

c) *Fredrick Joiner v. DeKalb County School District*, 17CV11306, DeKalb

   County Superior Court, State of Georgia.

163.

Defendants violated Woods' rights to equal protection of law and due

process under the 14th Amendment to the United States Constitution, which rights

are well established.

WHEREFORE, Plaintiff Woods demands that she have trial by jury and

judgment against Defendants as follows:

a) For lost wages in an amount to be determined at trial;

b) For lost benefits in an amount to be determined at trial;

c) For compensatory damages in an amount to be determined at trial;

d) For front pay in an amount to be determined at trial;

e) For punitive damages in an amount to be determined at trial;

f) For a declaratory judgment that Defendants' actions were unlawful;

g) For injunctive relief in ordering Defendants cease ignoring employees civil rights;

h) For injunctive relief requiring DCSD to immediately limit Smith and Summerlin's ability to deny or interfere with the civil rights of current DCSD employees including but not limited to Dr. Edward Baety and Dr. Ashwin Iyer;

i) For her costs and expenses;

j) For her attorney's fees; and

k) For such other and further relief as is just, proper, or equitable.

This 29th day of September, 2023.

/S/ Drew Mosley
Drew Mosley
Attorney for Plaintiff
GA Bar No. 526406
Drew Mosley, LLC
279 W. Crogan Street
Lawrenceville, GA 30046
Office Phone (678) 225-0098
Office Fax (678) 221-0230
Email: drew@mlawmail.com