IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DESIREE WOODS,

     Plaintiff,

v.

DEKALB COUNTY SCHOOL
DISTRICT, ANGELA SMITH,
MICHELE SUMMERLIN,

     Defendants.

CIVIL ACTION FILE NO.

1:23-cv-4457-MLB-JKL

## **ORDER AND FINAL REPORT AND RECOMMENDATION**

Plaintiff Desiree Woods brings this action against her former employer, Defendant DeKalb County School District ("DCSD"), as well as two employees of the DCSD, Angela Smith and Michele Summerlin, in both their individual and official capacities. She asserts claims for race discrimination and a hostile work environment under 42 U.S.C. §§ 1981 and 1983 and conspiracy to interfere with civil rights under 42 U.S.C. § 1985. The case is before the Court on Defendants' motion for summary judgment [Doc. 60] and Plaintiff's motion for leave to file a surreply [Doc. 69]. For the reasons that follow, it is **RECOMMENDED** that

Defendants' motion be **GRANTED**.  It is **ORDERED** that Plaintiff's motion to

file a surreply be **DENIED**.[1]

## I.    SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues

of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing that it is

entitled to summary judgment.  *Id.* ("The court shall grant summary judgment if

the movant shows that there is no genuine dispute as to any material fact and the

---

[1] Typically, surreplies are permitted "only in unusual circumstances, such as where a movant raises new arguments or facts in a reply brief, or where a party wishes to inform the Court of a new decision or rule implicating the motion under review."  *Harris v. F.D.I.C.*, 885 F. Supp. 2d 1296, 1308 (N.D. Ga. 2012).  In Plaintiff's motion, she makes an *ipse dixit* assertion that a surreply is warranted due to "1) new contentions of law from Defendant, and 2) new argument from Defendant."  [Doc. 69 at 2.]  Plaintiff does not even begin to explain, however, what new law or arguments Defendants supposedly raised in reply, and so for this reason alone, her motion fails.  Even in Plaintiff's reply to Defendants' opposition to the motion for surreply, Plaintiff fails to point to the new law or new arguments she raises and, instead, simply states that the surreply "speaks for itself."  [Doc. 71 at 3.]  Of course, as just observed, it does not.  But what's more, Plaintiff's 15-page proposed surreply is not targeted at new issues; rather, it is quite obviously an attempt to get the last word in and regurgitate arguments she has already made.  Accordingly, Plaintiff has not shown that a surreply is warranted.  *See Stanton v. NCR Pension Plan*, No. 1:17-CV-2309-MLB, 2021 WL 1170109, at *4 (N.D. Ga. Mar. 29, 2021) (finding that a surreply was unwarranted and noting that allowing surreplies as a regular practice would require the Court to referee an endless volley of briefs).

movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial"). The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.

2005).  Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

## II.    BACKGROUND

In setting out the facts of this case, the Court has considered Defendants' Statement of Material Facts ("DSMF" [Doc. 60-1]), Plaintiff's Response to the DSMF, ("R-DSMF" [Doc. 67-2]), and Plaintiff's Statement of Additional Material Facts ("PSAMF" [Doc. 67-3][2]); and, where possible, the Court has relied on those statements of facts and responses.[3]  The Court will not rule on each and every objection or purported dispute presented by the parties, and will discuss

---

[2] Defendants did not file a response to Plaintiff's statement of additional facts as required by the Local Rules.  *See* LR 56.1(B)(3), NDGa.  Even so, the Court cannot consider most of those statements for purposes of the present motion because, as will be discussed in more detail below, Plaintiff's statements consist almost entirely of her own conclusory assertions or speak to matters about which she has no personal knowledge.

[3] Plaintiff's responses to the DSMF are largely unhelpful.  In contravention of the local rules, her responses are lengthy, contain copious amounts of immaterial information, and are argumentative.  *See* LR 56.1(B)(2)(a)(2).

objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact. The Court has also conducted its own review of the record, including the depositions and declarations filed in this case, and includes facts drawn from its independent review of the record. *See* Fed. R. Civ. P. 56(c)(3).

In March 2012, the DCSD hired Plaintiff, who is white, as the Director of the DeKalb-Rockdale Georgia Network for Educational and Therapeutic Support ("GNETS"). (DSMF ¶ 1.) Plaintiff's supervisor during the relevant time was Defendant Summerlin, who is African-American. (*Id.* ¶ 2.) The GNETS program is part of the DCSD's special education operations. (*Id.*) In her role, Plaintiff oversaw GNETS programs at two locations, Shadow Rock Center and Eagle Woods Academy ("Eagle Woods"). (*Id.* ¶ 3.) Plaintiff's office was located at Eagle Woods. (*Id.* ¶ 7.) Plaintiff was responsible for ensuring both schools' programs fulfilled the overarching goals of GNETS. (*Id.* ¶ 4.) The day-to-day operations of those programs were overseen by a "Coordinator III." (*Id.*) Defendant Smith, who is African-American, served as the Coordinator III for Eagle Woods. (*Id.* ¶ 7.) Smith reported to Plaintiff. (Pl. Dep. [Doc. 60-4] at 35.)

The work environment at Eagle Woods was factious. One major source of friction was that some of the staff members at Eagle Woods identified themselves

as "Team Woods" or "Team Smith," signifying whether they took directions from either Plaintiff or Smith.  (DSMF ¶ 9.)  One of Plaintiff's reports was Dr. Edward Lundy Baety, a behavioral specialist for GNETS.  (Dep. of Dr. Edward Lundy Baety [Doc. 63-1] at 20-21.)  At some point after he started reporting to Plaintiff, Smith asked Dr. Baety why he was "doing what a white woman was telling [him] to," which caused him to believe that Smith "had a problem with Ms. Woods being white."[4]  (*Id.* at 35.)  Dr. Baety also testified that Smith "had a direct pipeline" to individuals higher up within the DCSD organization, meaning that she held influence over people to whom Plaintiff answered.  (*Id.*)

According to Smith, the "Team Woods" and "Team Smith" division "definitely created a . . . hostile work environment."  (Dep. of Smith, Vol. II [Doc. 64-1] at 29.)  Smith explained that having subordinates answer to more than one person took "a lot of unnecessary time" and that when everyone was not "working on one team" it "ultimately create[d] division."  (*Id.*)  Smith also clarified that her use of the phrase "hostile work environment" did not mean that

---

[4] For her part, Smith testified that she did not recall ever asking anyone, "Why are you taking orders from a white woman?" (Dep. of Smith, Vol. I [Doc. 64] at 143.)  But because the Court must take all factual inferences in Plaintiff's favor, the Court accepts Dr. Baety's version of the events for present purposes.

anyone was acting based on gender or race, but that she was simply describing a toxic work environment. (*Id.* at 30-31.)

At some point, Plaintiff heard that Smith commented to others that Plaintiff, as a white woman, could not teach African-American children. (Pl. Dep. at 33-34.) Plaintiff was also told that Smith commented negatively to other employees about Plaintiff's efforts to collect money for the family of an African-American child who had passed away, questioning why a white woman was collecting money for an African-American child. (*Id.* at 33-35; *see also* Decl. of Dr. Edward Lundy Baety [Doc. 67-5] ¶ 3 (stating that Smith commented "that a white woman should not be collecting money for an African-American child's funeral").) None of these comments were made directly to Plaintiff, however.

At the end of 2021 or the beginning of 2022, "five or six staff members" called out on the same two days, which Plaintiff was told was a protest about her treatment of an African-American student—more specifically, their complaint that the student had not yet been transferred from the special education program back to his home school's general population. (Pl. Dep. at 50-52, 54, 62.) Plaintiff wanted to ask those staff members for doctor's notes to justify their absences, but Summerlin told her not to do so. (*Id.* at 54.) There is no evidence that Plaintiff was disciplined for either the "protest" or the underlying decision.

7

At some point, Dr. Paula Freer, one of Plaintiff's and Smith's subordinates at Eagle Woods, filed a complaint with the DCSD's Employee Relations Department alleging divisiveness at Eagle Woods because of the "Team Woods" and "Team Smith" divide, among other things.  (DSMF ¶¶ 10, 11); [*See also* Doc. 60-7 (report of investigation).]  The Employee Relations Department investigated the complaint and, on June 30, 2022, issued a report that concluded the leadership and reporting structure at Eagle Woods created "confusion and dissension amongst the employees."  [Doc. 60-7 at 5.]  The report recommended that "the leadership structure and duties of each member on the leadership team be clearly defined and communicated with staff" and that Plaintiff's office be relocated to a central location in the DCSD "and/or the reporting structure change to minimize reporting issues/conflicts at the Eagle Woods site."  [*Id.* at 11.]  That same day, June 30, Plaintiff resigned from her position.  (DSMF ¶ 15.)[5]  Plaintiff did not receive a copy of the report before she resigned.  (Decl. of Pl. [Doc. 67-4] ¶ 12.)

---

[5] Plaintiff has neither refuted nor stated valid objections to DSMF ¶ 15, thus, it is deemed admitted because it is supported by the cited evidence.

## III.    DISCUSSION

### A.    Preliminary Evidentiary Matters

Before turning to the analysis, the Court notes the paucity of evidence put forth by Plaintiff in her attempt to withstand summary judgment.  Plaintiff cites largely to unsupported or conclusory statements, either from the PSAMF, the R-DSMF, or the amended complaint.[6]  [*See* Doc. 67-1.]  Most egregious of all is Plaintiff's declaration in support of her response to the motion for summary judgment.  [*See* Doc. 67-4.]  Plaintiff relies on a variety of general assertions contained in her declaration to support her claims, and indeed, devotes the entirety of her statement of additional material facts to parroting statements asserted in her declaration.  [*Compare* Doc. 67-3, *with* Doc. 67-4.]  The Court notes the convoluted nature of these filings, which both mirror each other and cite to each other in a circular, unsupported fashion.  For the most part, the declaration

---

[6] At one point, Plaintiff cites to another section of her brief, making it unclear what evidence she asserts supports each claim.  [*See* Doc. 67-1 at 16 ("As explained in the racial discrimination analysis above, the conduct allegedly suffered by Plaintiff was severe enough to alter the terms and conditions of her employment…").]  She also cites allegations in the amended complaint as evidence of particular instances of harassment.  [*Id.* at 10 (citing Am. Compl. [Doc. 24] ¶¶ 25-38, 44-51, 61, 89-91, 97).]  But, of course, "allegations in an unsworn complaint are not evidence for purposes of summary judgment and, thus, cannot be considered."  *Mathews v. Clark Atlanta Univ., Inc.*, No. 1:17-CV-2963-MLB, 2023 WL 2229670, at *11 (N.D. Ga. Jan. 13, 2023) (alteration adopted; citations omitted).

is extremely conclusory and consists of assertions about which Plaintiff has no personal knowledge. The statements include:

- "Desiree Woods' job as GNETS Director was made impossible by the racially divisive atmosphere Angela Smith fomented and Michele Summerlin ratified and prevented Woods from addressing" (Pl. Decl. ¶ 25);

- "Defendants' allegation that Plaintiff frequently impeded the Coordinator III of Eagle Woods Academy's ability to efficiently conduct her duties and responsibilities as the building leader is false" (*id.* ¶ 26);

- "Coordinator III Angela Smith did not want to take instruction from a white woman, namely Desiree Woods" (*id.* ¶ 27);

- "Angela Smith was frequently insubordinate to Desiree Woods when Woods was GNETS director" (*id.* ¶ 28);

- "By responding in a resentful manner as if everything were a racial issue, Smith impeded Woods ability to direct Smith without retaliation from Smith and others" (*id.*);

- "Defendant Michele Sum[m]erlin (Black), rather than providing Woods the support she needed to address the hostile work environment and racial attacks against her, would do no more than suggest team building" (*id.* ¶ 29);

- "Angela Smith's technical competency for her role as Coordinator III was not what she thought it was. When [Plaintiff] gave her guidance on best practices, rules, regulations, and the like, Smith attributed these instructions to race rather than her own need for growth in her position" (*id.* ¶ 31); and

- "DeKalb County School District through Michele Summerlin and its other administrators approved, ratified, supported, and condoned Angela Smith's racial discrimination and insubordination presented as being caused by Desiree Woods' own alleged racism" (*id.* ¶ 32).

10

Nothing in these conclusory statements identifies concrete, cognizable events or conduct that the Court can evaluate in a meaningful way as either supporting or disproving that Smith, Summerlin, or any other representative of DCSD acted in a discriminatory manner.  As a result, these statements are insufficient to create a triable issue of fact.  *See*, *e.g.*, *James v. City of Montgomery*, 823 F. App'x 728, 731 (11th Cir. 2020) (affidavit testimony that white employees were better treated in unidentified ways could be disregarded as conclusory when it "provided no specific facts" identifying the actual treatment were provided), *cert. denied*, 141 S. Ct. 1688 (2021); *see also id.* ("Affidavits submitted in support of a summary judgment motion must be based on personal knowledge, show that the affiant or declarant is competent to testify, and set out facts that would be admissible under the Federal Rules of Evidence.  Conclusory allegations[, however,] have no probative value unless supported by specific facts.").

The Court now turns to Plaintiff's claims, beginning with her hostile work environment claim, followed by her disparate treatment claim, and finally her conspiracy claim.

### B.    Racially Hostile Work Environment Under 42 U.S.C. §§ 1981, 1983

In Count 2 of the amended complaint, Plaintiff asserts a hostile work environment claim.  (Am. Compl. ¶¶ 147-163.)  Defendants argue that the claim

fails because (1) the alleged harassment was not based on her race, as any alleged conduct was a "result of Plaintiff's frequent interference in daily operations"; and (2) the alleged harassment was not severe or pervasive enough to alter the terms and conditions of her employment.[7]  [Doc. 60-2 at 12-14.]  Plaintiff responds in a conclusory fashion, arguing that the "allegation that Woods interfered with operations, with Smith, or with anything like that is pretext" and that the alleged harassment was "severe enough . . . and no reasonable employee in her position would have felt obligated to remain in the situation."  [Doc. 67-1 at 15-16.] Plaintiff cites no evidence to support these arguments.

To succeed on a racially hostile work environment claim, a plaintiff must prove that:  (1) she belongs to a protected group; (2) she suffered unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious

---

[7] Defendants also argue that, to the extent Plaintiff could show a racially hostile work environment, they are entitled to the *Faragher-Ellerth* affirmative defense, as the DCSD maintained an effective workplace harassment reporting process and Plaintiff failed to avail herself of that process.  [Doc. 60-2 at 14-15.]  The Court need not analyze the merits of this defense because no reasonable jury could conclude that Plaintiff has established a hostile work environment claim.

liability. *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F. 3d 1269, 1275 (11th Cir. 2002)).[8] In contrast to disparate treatment claims that are based on discrete discriminatory acts, hostile work environment claims rely on "the cumulative effect of individual acts" over time. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-16 (2002).

To show that conduct is "severe or pervasive," an employee must prove that her work environment was both subjectively and objectively hostile. *Fernandez*, 961 F.3d at 1153. That is, the employee must subjectively perceive "the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (quotation and marks omitted). "[T]o amount to a change in the terms and conditions of employment," the conduct "must be extreme." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the

---

[8] Discrimination claims, including hostile work environment claims, brought under § 1981 are subject to the same standards of proof and same analytical framework as those brought under Title VII of the Civil Rights Act of 1964. *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

13

circumstances.'" *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1335 (11th Cir. 2023) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). The Court proceeds with "'common sense, and an appropriate sensitivity to social context,' to distinguish between general office vulgarity and 'the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.'" *Reeves*, 594 F.3d at 811 (quoting *Oncale*, 523 U.S. at 82). The Court considers four factors when evaluating whether the harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Fernandez*, 961 F.3d at 1153 (quotation marks omitted).

Here, Plaintiff asserts that she experienced severe and pervasive harassment. But she does not direct the Court to any competent evidence to explain why the record supports a finding that the harassment was either severe or pervasive under existing precedent. [*See* Doc. 67-1 at 16.] And unsupported factual assertions, of course, are "legally insufficient to defeat a summary judgment motion." *See Ellis*, 432 F.3d at 1326. For this reason alone, Plaintiff fails

14

to carry her burden to show a triable issue of fact as to whether the conduct was sufficiently severe or pervasive.

Even so, the Court has attempted to identify evidence in the record that might possibly support Plaintiff's claim of a racially hostile work environment, and still readily concludes no reasonable jury could conclude that the workplace was objectively hostile. To start, Plaintiff has presented evidence that Smith harbored racial animus toward Plaintiff, including (1) Plaintiff's hearsay testimony[9] that Smith had (a) commented to others that Plaintiff could not teach African-American children and (b) questioned why Plaintiff was collecting money for an African-American child (Pl. Dep. at 33-35); and (2) Dr. Baety's testimony that he believed Smith "had a problem with Ms. Woods being white," based on his conversations with Smith (Baety Dep. at 35). But those were just two comments made by a subordinate employee, that while offensive, were not physically threatening or humiliating or, indeed, even made in Plaintiff's presence. *See Fernandez*, 961 F.3d at 1153; *see also Ivey v. Crestwood Med. Ctr.*, No. 23-11936, 2024 WL 1269765, at *1 (11th Cir. Mar. 26, 2024) (explaining that sporadic and isolated comments, even if racially derogatory, are not enough to

---

[9] This is only to say it is second-hand, not that it is inadmissible for purposes of summary judgment.

create a hostile work environment); *McCann v. Tillman*, 526 F.3d 1370, 1378-79 (11th Cir. 2008) (affirming summary dismissal of hostile work environment claim where alleged conduct included two demeaning comments made in plaintiff's presence and two additional racial epithets spoken outside her presence in a period of less than three years). And significantly, there is no evidence that any other DCSD employee made racially discriminatory comments or used slurs directly toward her. In the end, even if Plaintiff legitimately felt Smith undermined her authority, this sort of interpersonal workplace conflict (particularly from a subordinate toward a supervisor) is insufficient to show a racially hostile work environment claim. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (explaining that federal courts do not sit as a "super-personnel department").

Next, the Court considers Summerlin's handling of the incident where several employees called out sick (which Plaintiff characterizes as a "protest" directed at her). [*See* Doc. 67-1 at 9.] It is unclear how a single, isolated episode where employees—in fact, subordinates to Plaintiff—called out of work in protest of the treatment of a student somehow created a hostile work environment. (*See* Pl. Dep. at 51-54.) To start, there is very little evidence tending to show the "protest" was motivated by Plaintiff's race; rather, it was, as Plaintiff

testified, about the employees' belief that she was treating a student "unfairly" because she was "not supporting [that] student leaving Eagle Woods to go back to their home school."[10]  (Pl. Dep. at 50, 53.)  Moreover, it had no impact on Plaintiff's terms and conditions of employment—she was not disciplined in any way for the absent employees or in relation to student's transfer/nontransfer. Nor did the purported "protest" involve any threats of physical harm or humiliation to Plaintiff.  And even construing the evidence in the light most favorable to Plaintiff, Summerlin's advice that Plaintiff not demand doctors' notes from the protesting employees, at worst, shows a lack of support for Plaintiff's decisions or leadership—but not a hostile work environment based upon Plaintiff's race.[11]

_____

[10] Plaintiff testified that she recalled one teacher accusing her of not wanting to transfer the student because he is African-American, but that teacher's comment was (1) made in relation to Plaintiff's own motivations for keeping the student at Eagle Woods, and does necessarily implicate Plaintiff's own race, and (2) represented but a single viewpoint of the five or six employees, who as a group simply told staff members "to stay out" to protest the student not returning to his home school.  (*See* Pl. Dep. at 53.)

[11] In her response, Plaintiff also notes that in 2019, she issued Smith a "letter of direction, but was constrained in what she could do without expanded harassment and ratified retaliation."  [Doc. 67-1 at 11.]  Plaintiff's meaning here is hard to decipher, but it appears she is arguing Summerlin constrained her ability to address "the hostile work environment Smith created."  [*Id.*] Regardless, Plaintiff cites no evidence to support her assertion that she was prevented from disciplining Smith, and the letter of direction Plaintiff issued

17

Plaintiff also tries to make hay of Smith's statement during her deposition that there was a "hostile work environment," arguing that this testimony on its own creates a genuine issue of material fact about whether Plaintiff was subjected to a hostile work environment. [Doc. 67-1 at 4 n.1.] Not so. For starters, whether a racially hostile work environment existed is a complex legal conclusion that Smith is not qualified to provide. But more to the point, Smith does not come close to stating that Plaintiff herself was ever subjected to a *racially* hostile work environment. Rather, she testified that she felt, as a lay person, that a "hostile work environment" existed at Eagle Woods because some employees followed Plaintiff's directives, rather than hers—that is, because of the "Team Woods" versus "Team Smith" dynamic. (*See* Smith Dep., Vol. II at 29-31.) There is not a shred of evidence, however, that race had anything to do with those employees' actions. And if that were not enough, Smith's testimony makes clear that she was

_____

Smith shows only that Plaintiff was Smith's supervisor and had given her a disciplinary warning in 2019. [*See* Doc. 60-11.]

Even if Plaintiff did have evidence that Summerlin somehow limited her disciplinary actions against Smith, without more—such as evidence tying Summerlin's allegedly disciplinary limitations to Plaintiff's or Smith's race and evidence that the limitation actually interfered with her job performance—such constraints would show little more than a lack of support for Plaintiff's decisions and leadership, rather than evidence of an objectively hostile work environment based upon race.

explaining how Plaintiff's actions made it more difficult for Smith to do her job—not the other way around. (*See id.* at 29-30.) Thus, properly understood, Smith believed that the work environment was "hostile" towards herself, because her own subordinates were questioning her directives.[12]

Finally, the recommendation contained in the June 30, 2022 investigation report that Plaintiff's office be relocated from Eagle Woods is not evidence of harassment, because it is undisputed that Plaintiff resigned from her position before receiving that recommendation. (*See* Pl. Decl. ¶ 12.) Thus, it could not have had any effect whatsoever on the terms and conditions of her employment. Further, Plaintiff offers nothing but her own speculation that the recommendation was somehow tainted by racial animus. Plaintiff does not provide a scintilla of evidence that suggests the individuals in charge of the

---

[12] Plaintiff complains that, during Smith's deposition, defense counsel interrupted the examination after Smith used the phrase "hostile work environment" and asked clarifying questions that prevented Smith from providing more damning testimony "in support of [Plaintiff]'s case." [Doc. 67-1 at 4 n.1.] (*See also* Smith Dep. Vol. 2 at 29-31.) While the Court takes a dim view of defense counsel's interruption at the deposition, Plaintiff does not even begin to suggest what additional testimony Smith would have given that would have been helpful to Plaintiff's case. Indeed, it is very obvious from the context that Smith was not admitting that there was a *racially* hostile work environment—she simply used the term "hostile work environment" to describe what she thought was an unpleasant working environment. At no point did Smith admit that she or anyone else was motivated by discriminatory animus.

report acted on racial animus, and all the record evidence suggests they simply made an organizational decision to remedy interpersonal conflict.[13]

In sum, viewing the evidence cumulatively and giving Plaintiff the benefit of all reasonable factual inferences, Plaintiff has not presented sufficient evidence to permit a reasonable factfinder to conclude that she was subjected to severe or pervasive harassment or that the vast majority of the purported harassment alleged in this case had anything to do with Plaintiff's race. Accordingly, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment on this claim be **GRANTED**.

## C. Race Discrimination Under 42 U.S.C. §§ 1981, 1983

In Count 1, Plaintiff asserts a disparate treatment claim. (Am. Compl. ¶¶ 132-144.) In moving for summary judgment on that claim, Defendants argue that

---

[13] Plaintiff argues that the recommendation "proves the discrimination [she] alleges." [Doc. 67-1 at 11.] In fact, it does no such thing. Perhaps Plaintiff is advancing something akin to a "cat's paw" theory of liability, which is where "a non-decision making employee's discriminatory animus may be imputed to a neutral decisionmaker when the decision maker has not independently investigated allegations of misconduct." *Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998)). But nothing in the report (or the record before the Court) suggests that the authors acted with racial motives, that its recommendations were somehow tainted by Smith's purported racial animus, or that the report otherwise lacked independence.

Plaintiff cannot show a prima facie case of race discrimination because she suffered no adverse employment action, and in any event, lacks a comparator to establish an inference of discriminatory intent.  [Doc. 60-2 at 5-10.]  Defendants also argue that, even if Plaintiff could make a prima facie showing of racial discrimination, she cannot demonstrate pretext because all of the alleged conduct was "a result of a difference in opinions on what roles both Plaintiff and Smith played in the organizational structure of GNETS and not a result of racial discrimination."  [*Id.* at 11.]

Plaintiff contends, however, that she has shown direct evidence of racial discrimination—namely, in the form of (1) Dr. Baety's deposition testimony that Smith "had a problem with [Plaintiff] being white," Smith "had a direct pipeline" to Summerlin, and that, when he worked under Plaintiff, Smith asked him why he was "doing what a white woman was telling [him] to," and (2) Smith's deposition testimony that there was a "hostile work environment."  [Doc. 67-1 at 7 (citing Baety Dep. at 35 and Smith Dep. Vol. II at 29-31).]  Plaintiff further argues that she has established a prima facie case of discrimination because she was constructively terminated—she quit under duress because her "employer treated her in a horrendous manner"—and, in support, she cites to the section of her

deposition where she testified that Summerlin would not allow her to request doctors' excuses for staff who called out sick in protest. [*Id.* at 8-9.]

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (citations omitted); 42 U.S.C. § 1981.   Thus, "to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor," *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 (11th Cir. 2019), whether through direct or circumstantial evidence, *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018).   As to the first, direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. *Jefferson*, 891 F.3d at 921.   The Eleventh Circuit narrowly defines direct evidence to include "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id.* at 922 (cleaned up).   Racially derogatory comments can be direct evidence only if the comments were made:  (1) by the decisionmaker responsible for the alleged discriminatory act, (2) in the context of the challenged decision, and (3) in temporal proximity to the employment decision.   *See*

22

*Robertson v. Riverstone Communities, LLC*, 849 F. App'x 795, 801 (11th Cir. 2021); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that a racially derogatory comment was not direct evidence when it was made by "merely" a co-worker over two years prior to the plaintiff's termination). Because of this, remarks unrelated to the decision-making process are not direct evidence of discrimination. *Scott*, 295 F.3d at 1228; *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty.*, 256 F.3d 1095, 1105 (11th Cir. 2001), *overruled in part on other grounds*, *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

In the absence of direct evidence—that is, when a plaintiff relies on circumstantial evidence of discrimination—she can demonstrate a genuine issue of fact by satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lewis*, 918 F.3d at 1220. Under that framework, the plaintiff must first establish a prima facie case of discrimination by presenting evidence that (1) she belongs to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably. *See id.* at 1220-21. If the plaintiff does so, the burden shifts to the employer to articulate a legitimate reason for the adverse action. *Id.* Should the employer meet that burden, then the burden returns to the plaintiff to show that the

employer's proffered reason is pretextual and the true reason for the adverse action was unlawful discrimination or retaliation. *Id.*

Alternatively, a plaintiff may also prove discrimination by presenting a "convincing mosaic" of evidence sufficient to allow a reasonable factfinder to infer intentional discrimination. *Sanusi v. Grady Mem'l Hosp. Corp.,* No. 23-13376, 2025 WL 1661912, at *2 (11th Cir. June 12, 2025) (citing *Tynes v. Fla. Dep't of Juv. Just.,* 88 F.4th 939, 946-47 (11th Cir. 2023); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023)). "A convincing mosaic 'is a metaphor, not a legal test and not a framework.'" *Id.* (quoting *Berry*, 84 F.4th at 1311). "In essence, the convincing mosaic approach is simply a 'rearticulation of the summary judgment standard.'" *Id.* (quoting *Tynes*, 88 F.4th at 946) (alteration adopted). "Ultimately, regardless of how the plaintiff presents her evidence, the inquiry for a court at summary judgment is whether enough evidence permits a reasonable factfinder to find that the employer discriminated against or retaliated against the plaintiff." *Id.*

And regardless of whether a plaintiff proceeds on direct or circumstantial evidence, to state a claim for disparate treatment, a plaintiff must show that she suffered an adverse employment action. *See Davis v. Legal Servs. Ala., Inc.,* 472 F. Supp. 3d 1123, 1129 (M.D. Ala. 2020), *aff'd,* 19 F.4th 1261 (11th Cir. 2021); *see also*

*Franks v. Chitwood*, 572 F. Supp. 3d 1304, 1347 (N.D. Ga. 2021) (explaining that under both the *McDonnell Douglas* framework and the convincing mosaic standard a plaintiff must still demonstrate he suffered an adverse employment action).  An adverse employment action "is any action that has a negative impact on 'the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way.'"  *Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)).  This includes "things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone.'"  *Id.* (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020)).  Pertinent to the present inquiry, "[a]n involuntary resignation that constitutes a constructive discharge is an adverse employment act," *Ross v. City of Perry, Ga.*, 396 F. App'x 668, 670 (11th Cir. 2010), and "occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job," *Bryant*, 575 F.3d at 1298 (quotation omitted).  Significantly, establishing a constructive discharge is "more onerous" than establishing a hostile work environment claim.  *Id.*

      Turning back to the parties' arguments, then, Plaintiff's contention that she has presented direct evidence of discrimination is without merit.  Dr. Baety's

testimony may permit a reasonable jury to conclude that Smith made racially derogatory comments, but those comments are not direct evidence of racial discrimination because Smith was not a decisionmaker in relation to employment decisions about Plaintiff (in fact, she was a subordinate to Plaintiff) and the comments were not made in the context of a challenged employment decision. *See Robertson*, 849 F. App'x at 801; *Scott*, 295 F.3d at 1228. And Dr. Beaty's belief that there was an issue between Plaintiff and Smith because of Plaintiff's race is simply his own opinion; without concrete facts in support, it is simply not evidence of discrimination. Similarly, Smith's deposition testimony that there was a "hostile work environment" in no way evinces racially discriminatory intent, for the reasons explained above.

Even more fundamentally, Plaintiff's disparate treatment claim fails because Plaintiff's resignation from employment does not qualify as an adverse employment action. Plaintiff argues that she suffered an adverse employment action because she was constructively discharged. She bases this assertion on essentially the same circumstances that support her hostile work environment claim. But in this Circuit, a plaintiff who has failed to show that she was subjected to a severe or pervasive hostile work environment cannot meet the higher burden required to establish a constructive discharge. *See Bryant*, 575 F.3d at 1298; *see*

*also Gray v. Koch Foods, Inc.*, ___ F. 4th ___, No. 22-13214, 2025 WL 1932964, at *9 (11th Cir. July 15, 2025) (explaining that a hostile work environment is a necessary predicate to a constructive discharge case based on a hostile work environment). And because Plaintiff has not presented sufficient evidence to support a hostile work environment, it necessarily follows that the same conduct cannot support a constructive discharge claim.[14]

Accordingly, the undersigned **RECOMMENDS** that Defendants' summary judgment motion be **GRANTED** as to Plaintiff's disparate treatment claim.

---

[14] In her response, Plaintiff vaguely asserts that she was excluded from communications, discouraged from participating in activities indicated to be exclusively for African-Americans, and undermined professionally. [Doc. 67-1 at 9-10.] But she provides *no competent evidentiary support* for these assertions and, instead, simply cites to the amended complaint and generally to her responses to the Defendants' statement of material facts and her conclusory and unsupported allegations in her declaration. [*See id.* at 10.] In any event, these naked allegations—even if they were tethered to competent evidence—are insufficient to meet the high bar necessary to show constructive discharge. *See Nettles v. LSG Sky Chefs*, 211 F. App'x 837, 839 (11th Cir. 2006) (holding that plaintiff failed to show that he suffered adverse employment action or was constructively discharged in spite of evidence showing that the defendant undermined his authority in front of others, excluded him from an important business meeting, denied him administrative support for a business trip, did not give him the highest rating on his performance evaluation, and offered him a position on terms and conditions that were less favorable than those offered to others).

**D.    Conspiracy to Interfere With Civil Rights Under 42 U.S.C. § 1985**

Finally, in Claim 3, Plaintiff alleges Defendants conspired to interfere with her civil rights, seeking together to deprive her of the equal protection of laws. (Am. Compl. ¶¶ 164-171.)  Defendants argue that this claim fails because Plaintiff cannot show either that (1) she has been deprived of any rights or privileges by Defendants, or that (2) there was any conspiracy amongst Defendants.  [Doc. 60-2 at 21-22.]  Plaintiff responds that Dr. Baety's testimony "establishes the pipeline from Smith to Summerlin, as well as the open discrimination by Smith" and that she can therefore show she has been deprived of rights and privileges by Defendants.  [Doc. 67-1 at 20.]  She further argues that she can show a conspiracy amongst Defendants and states that the "intercorporate conspiracy doctrine does not [preclude][15] a conspiracy as shown here to discriminate based on race."  [*Id.* at 21.]

The elements of a § 1985 conspiracy claim alleging the deprivation of rights or privileges are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws,

---

[15] Plaintiff's brief uses the word "permit" [*see* Doc. 67-1 at 21], but the Court assumes this was a scrivener's error, and that Plaintiff is not arguing against her own claim.

or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (internal quotation marks omitted); *see* 42 U.S.C. § 1985(3).  The intracorporate conspiracy doctrine, which applies to public entities, holds that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves.  *See Denney*, 247 F.3d at 1190; *see also Reaves v. City of Montgomery*, No. 2:22-CV-458-ECM, 2024 WL 1349020, at *6 (M.D. Ala. Mar. 29, 2024) (dismissing a § 1983 claim where the alleged conspiracy occurred only within a government entity and, thus, the intracorporate conspiracy doctrine applied).

Because Plaintiff's discrimination claims fail on the merits, the conspiracy claim thus fails as well.  *See Denney*, 247 F.3d at 1190.  Thus, the Court need not, and does not, address whether the intercorporate conspiracy doctrine applies here.

Accordingly, the undersigned **RECOMMENDS** that Defendants' motion summary judgment also be **GRANTED** on Plaintiff's final claim.

## IV.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Defendants' motion for summary judgment, [Doc. 60], be **GRANTED**.  Plaintiff's motion for leave to file a surreply brief [Doc. 69] is **DENIED**.

IT IS SO ORDERED AND RECOMMENDED this 17th day of July, 2025.

_____
JOHN K. LARKINS III
United States Magistrate Judge